IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 18, 2014

## STATE OF TENNESSEE v. JARON HARRIS

**Appeal from the Criminal Court for Knox County**
**No. 98218B      Bob R. McGee, Judge**

_____

**No. E2014-00822-CCA-R3-CD - Filed February 28, 2015**

_____

A Knox County jury convicted the Defendant, Jaron Harris, of two counts of especially aggravated kidnapping, two counts of aggravated robbery, four counts of first degree felony murder, one count of second degree murder, one count of attempted second degree murder, two counts of employing a firearm during the commission of a dangerous felony, and two counts of aggravated assault. The trial court merged several of the convictions, dismissed one count of aggravated assault, and then sentenced the Defendant to serve a total effective sentence of life plus fourteen years. On appeal, the Defendant asserts that: (1) the evidence is insufficient to support his convictions; and (2) the trial court erred when it allowed cross-examination of the Defendant about statements he made to other inmates about escaping from the courtroom. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the Appellant, Jaron Harris.

Herbert H. Slatery, III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Charme Allen, District Attorney General; and Ta'Kisha Fitzgerald, Assistant District Attorney General for the Appellee, State of Tennessee.

**OPINION**
**I. Background and Facts**

This case arises from the shooting death of Sawyer Webb ("Victim Webb"), on October 13, 2011. A Knox County grand jury indicted the Defendant and a co-defendant, Devin Jamison, for two counts of especially aggravated kidnapping, two counts of aggravated robbery, four counts of felony murder, one count of first degree premeditated murder, one count of attempted first degree premeditated murder, two counts of employing a firearm during the commission of a dangerous offense, and two counts of aggravated assault.

At a trial on the charges, the parties presented the following evidence: Jessica Lupek testified that, on October 13, 2011, she was visiting her boyfriend, Sean Drewery, at his apartment at the Grand Forest apartment complex. Mr. Drewery shared apartment 107 with three other men, Phillip Gentis, "Cody," and "Wes." She said that she and Mr. Drewery were outside smoking when she observed a green SUV drive by the apartment complex and return and enter the complex traveling "the wrong way." The green SUV passed Mr. Drewery's building and then stopped. The occupants of the green SUV called Mr. Drewery over to the vehicle and asked if he knew where they could "get any weed." She stated that she thought it was odd for someone to ask a "random person on the street" where to obtain illegal drugs.

Ms. Lupek testified that she observed two men in the front of the SUV and "shadows" moving in the back of the vehicle. After speaking with Mr. Drewery for several minutes the men in the green SUV drove away. Ms. Lupek said that she and Mr. Drewery had taken down the vehicle model, make, and tag number. The two returned inside the apartment and told Mr. Gentis about their interaction with the occupants of the green SUV and then left the apartment again to go to "McKay's." As they left, they noticed that the green SUV had circled back around, and the occupants were now talking to another couple several apartment buildings down.

Ms. Lupek testified that, while at McKay's, Mr. Gentis called to say that "something had happened and [they] needed to get back [to the apartment] as soon as possible." Ms. Lupek said that, after speaking with Mr. Gentis, they left McKay's "immediately." Ms. Lupek identified a photograph of the green SUV that she had seen at Grand Forest apartment complex on October 13, 2011.

Sean Drewery testified that, on October 13, 2011, he and Ms. Lupek planned to go shopping. While still at his apartment he observed a green SUV pull into the complex. The occupants called out to him, and he initially pretended not to hear them. The men continued asking Mr. Drewery to approach the vehicle, and he eventually complied. He described the men as "straightforward," asking him about where drugs could be purchased. Mr. Drewery said that the men pointed to different buildings indicating that they had been told they could "get stuff" at those locations. Mr. Drewery told the men that, due to a recent outbreak of robberies and burglaries in the complex, "everybody" was on "real high alert." As such, he

did not believe that anyone was "doing anything at the time." The men continued to question Mr. Drewery until he terminated the conversation and returned to his apartment. He said that this incident "raised [his] suspicion," so he notified his roommate of his interaction with the occupants of the green SUV.

Mr. Drewery testified that, as he and Ms. Lupek left the apartment complex to go shopping, he saw the green SUV driving through the complex again. He called his roommate, Mr. Gentis, and asked him to call "all of [their] friends" and warn them to lock their doors. While shopping, Mr. Drewery received a telephone call from Mr. Gentis informing him that investigators were waiting to speak with him at the apartment. Mr. Drewery identified a photograph of the green SUV that he had seen at Grand Forest apartment complex on October 13, 2011.

Philip Gentis testified that, on October 13, 2011, he resided at the Grand Forest Apartments. He stated that he knew the residents of apartment 322 as "Rhett, Nathan, and Sawyer [Webb]." He explained that his roommate, Mr. Drewery, had told him about a green Nissan Xterra that had been in the parking lot the night before and was again in the parking lot "looking for some kind of drug or [m]arijuana." Mr. Gentis said that, when he left his apartment to warn other residents about the suspicious vehicle, he noticed a green Nissan Xterra in the parking lot parked behind a light-colored Tahoe. When he returned from warning others, he noticed that police were present.

Mr. Gentis testified that, before he left his apartment to warn other residents, he spoke with Victim Webb. He said he saw Victim Webb walking through the complex and called him over to the front door of his apartment. Mr. Gentis pointed out the green Nissan Xterra in the parking lot to Victim Webb and then urged him to " [g]o home and be careful, lock your door, don't answer your door." Victim Webb agreed and left. Mr. Gentis then went to two other apartments to warn the residents of the suspicious vehicle. It was after he returned from the other two apartments that he saw the police. Mr. Gentis said that he approached the police and cooperated with the investigation.

On cross-examination, Mr. Gentis testified that he was aware that Victim Webb was a "drug dealer." He denied any involvement in drug dealing. Mr. Gentis said that a white male was the occupant of the Tahoe. He could not describe the occupant or occupants of the green Nissan Xterra due to the "heavily tinted" windows but estimated that there were two to four black men in the SUV.

Michael Mays, a Knox County Emergency Communications District employee, testified that he served as the records manager and identified a copy of a report and an audio-recording of the October 13, 2011, 911 call concerning a shooting at apartment 322 in the Grand Forest Apartments. According to the CAD report, the 911 call was received at 6:05

p.m., and the first police unit arrived at 6:08 p.m. The audio recording was played for the jury. On the audio recording, a female can be heard requesting medical assistance for her neighbor, Victim Webb, who had been shot. She could provide no other information and dispatch requested she find someone who could provide more information. A male voice can be heard on the recording and he identified himself as Victim Webb's roommate. He explains that he was in the shower when he heard gunfire. When he emerged from the bathroom, he found Victim Webb and another man had been shot. He could not identify where Victim Webb had been shot, but he indicated that Victim Webb was in the caller's "friend's closet." The other man had been shot in the leg.

Beth Goodman, a Knoxville Police Department evidence technician, testified that she photographed the crime scene and collected evidence. She identified photographs taken of the apartment. She recalled that Victim Webb was inside a closet in one of the bedrooms when she arrived. Ms. Goodman stated that she photographed bullet holes in a door and a wall of the apartment. Additionally, she collected four shell casings, all the same caliber, and a bullet fragment. A bullet that had traveled through the wall was found lodged in a dresser in the adjoining apartment.

Ms. Goodman testified that after the completion of the autopsy, she collected from the Forensic Medical Center a bullet that was recovered from the Victim Webb's chest and a bullet that was recovered from his back. She also recovered Victim Webb's clothing. Inside the pocket of the pants Victim Webb was wearing at the time of the shooting was a plastic bag containing twenty-four grams of marijuana and a wallet containing $434.00 in cash.

Devin Jamison testified that he was charged with the same crimes as the Defendant. He agreed that, through his attorney, he had reached an agreement with the State as to the disposition of his charges. As part of the agreement with the State, he had agreed to testify truthfully as to the events of October 13, 2011. Mr. Jamison testified that he met up with the Defendant outside the Bi-Lo grocery store. Mr. Jamison got into the Defendant's Xterra and the men drove around for several hours smoking marijuana and listening to music. The Defendant drove, A.D.[1] was in the front passenger seat, and Mr. Jamison sat in the back seat behind the passenger. The Defendant asked Mr. Jamison if he wanted to go "half on another sack." Mr. Jamison agreed to split the cost of an eighth of marijuana with the Defendant. They drove "towards" Grand Forest where they asked "[t]he first people" about buying marijuana. When those persons were unable to help, they drove on.

Mr. Jamison said that, about five or ten minutes later, they approached a Caucasian man in a tan SUV. The man, later identified as Will Roser ("Victim Roser"), initially denied having any marijuana but then instructed the men to follow him. Mr. Jamison said they

---

[1]Because this person is a minor, we will refer to him by his initials.

followed Victim Roser's SUV "to a little spot on Kingston Pike called the Towers." Victim Roser showed Mr. Jamison the marijuana and then said he would go "upstairs" and weigh it, inviting Mr. Jamison to join him. Mr. Jamison explained to Victim Roser that he and the Defendant were both purchasing the marijuana. The Defendant exited the Xterra and examined the marijuana. Mr. Jamison said that Victim Roser seemed "hesitant" when both he and the Defendant were out of the car. After handing the marijuana back to Victim Roser, the Defendant pulled a nine-millimeter black gun out from his pants, pointed it atVictim Roser and stated, "we need everything, we need everything." Victim Roser threw up his hands and told the Defendant he could have the marijuana. He then told the Defendant that he could get more marijuana. Victim Roser got into the front seat of the Xterra with A.D. driving, and the men returned to the Grand Forest Apartments.

Mr. Jamison testified that, once at Grand Forest Apartments, he and the Defendant followed Victim Roser up a set of stairs to an apartment. A man, later identified as Rhett Barragan, answered the door and Victim Roser stated about the Defendant and Mr. Jamison, "they good, they with me." The three men entered the apartment and Mr. Barragan shut the door and locked it behind them. According to Mr. Jamison, all four men went to a back room where they looked at "different weed." They then moved to a different room to weigh the marijuana, and the Defendant pulled his gun out from his pants and said, "We need everything." Mr. Jamison said that he went "for the weed" to "get everything bagged up and make [his] way out."

Mr. Jamison testified that he interpreted the Defendant's statement, "We need everything," to mean that they were robbing these men. After the Defendant made this statement, Mr. Barragan, the man who had answered the door, stated, "Give them everything." The other men in the room complied, however, Victim Webb "pulled out a gun and cocked it back." Upon seeing Victim Webb with a gun, Mr. Jamison fled the apartment, hearing gunshots as he unlocked the front door. Once they were back in the Xterra, Mr. Jamison asked the Defendant what had happened and the Defendant responded, "it's good, everything good, everything good, like nobody didn't get shot." Mr. Jamison said that he asked to be taken back to his vehicle. After the Defendant switched vehicles with his mother, he returned Mr. Jamison to his car. Mr. Jamison testified that the Defendant took approximately an ounce of marijuana from Victim Roser while they were at the Towers. He said that he smoked the marijuana he took from the apartment. When asked if Victim Roser was free to get out of the Xterra and leave, Mr. Jamison stated, "I mean, I guess not, no. . . . I guess cause he felt like he had a gun at him first." Mr. Jamison said that he was arrested for his involvement in these crimes approximately a week later.

Mr. Jamison testified that he had prior misdemeanor convictions and arrests for driving on a suspended license, unlawful possession of a weapon, simple possession, traffic charges, reckless driving, criminal impersonation, and robbery. Based upon his past

experience with the police, Mr. Jamison agreed that he knew that he did not have to speak with police but that he willingly did so and admitted his involvement. He explained that he did so because he "thought [his] name was brung up by somebody else because [he] was on the news first for some reason or other." He further explained, "I didn't kill nobody, but I did what I did, so I just manned up to my charge."

On cross-examination, Mr. Jamison testified that he met the Defendant and A.D. at the Bi-Lo at around 9:00 or 10:00 a.m. At around 2:30 or 3:00 p.m., the Defendant suggested they buy "another bag of weed." Mr. Jamison estimated that it was 3:30 p.m. or 3:45 p.m. when they were driving back to the Grand Forest Apartments from the Towers with Victim Roser in the car. Mr. Jamison said that, after entering the apartment, there were three people in the back room: the man who opened the door, Mr. Barragan, and two other men sitting on the bed. Mr. Jamison said that he had never seen any of these men before. As Mr. Jamison looked at the marijuana, and Mr. Barragan weighed the marijuana, a man wearing black, Victim Webb, came down the stairs, and the Defendant called him over. Victim Webb joined the group and Mr. Jamison and Mr. Barragan discussed "a couple more things about the weed or whatever" before the Defendant pulled out his gun. Mr. Jamison said that when he heard the Defendant announce, "We need everything," he attempted "to go grab the weed." He stated that he was "gonna grab all the weed because it was a robbery." As he was doing so, he looked over his shoulder and saw Victim Webb display and cock a gun. Upon seeing Victim Webb with a gun, Mr. Jamison ducked and then ran toward the door. Mr. Jamison said that he did flee with the marijuana that was in his hand but that he did not take all of the marijuana. When he reached the front door, he heard gunshots. Mr. Jamison estimated that this occurred at around 4:00 p.m.

Mr. Jamison testified that, after being returned to his car, he drove to where he was staying and watched the news. He saw a story about the shooting at the Grand Forest Apartments and learned that someone had been shot in the leg. It was later that day that he learned that Victim Webb had died. Mr. Jamison testified that, after learning of this, he was "[l]aying low," trying to find out if his name was being associated with the shooting. He was later arrested for his role in these crimes.

James Farrell testified that on October 13, 2011, he lived in apartment 215 at the Grand Forest Apartments. He said that he was going down stairs to a neighbor's apartment when he saw two black men "sprinting" down the stairs of the building next door. One man was wearing a white shirt and the other was wearing a black shirt. The man wearing the black shirt held his hand on his waist the entire time. The two men jumped into a small green SUV and "almost before they even shut the doors, the car was taking off." The entire incident struck Mr. Farrell as "odd." He said that as the two black men were fleeing, a white man ran from one of the apartments to another apartment on the third floor. He appeared "panicked."

Patty Resig, a Knoxville Police Department firearms examiner, testified as an expert in the field of firearms examination. Officer Resig testified that she had examined some shell casings, bullet fragments, and a gun that was recovered in this case. She stated that all four cartridge cases were fired from the same weapon which was a nine millimeter Luger. Officer Resig examined four bullets. Two were fired from the same barrel and the other two could have been fired from the same barrel, but Officer Resig could not determine that with "scientific certainty." She confirmed that she was also provided with Victim Webb's .380 caliber Hi-Point automatic pistol. After testing, she determined that this gun could not have fired the nine millimeter casings.

Will Roser testified that on October 13, 2011, he lived "[o]n the Tower at Morgan Hill." He stated that he had met Rhett Barragan when he first moved to Knoxville from Savannah, Tennessee, to attend school. He said that he had never met the Defendant or Mr. Jamison before October 13, 2011. He recalled that early in the afternoon on October 13, he went to Mr. Barragan's apartment and bought about $100.00 worth of marijuana from him. When Victim Roser left the apartment, he found that his vehicle, a 2007 Yukon, was blocked by a dark green Nissan Xterra.

Victim Roser testified that the men in the green Xterra asked him for directions, which he provided, and then they asked about where they could buy marijuana. Victim Roser said that he was "kind of worried about it," but the men persisted. Victim Roser directed the men to where he lived, and they followed him. Once there, three men exited the vehicle. The men made small talk with Victim Roser and appeared friendly. Victim Roser told the men he would go upstairs and "bring back down" the amount of marijuana the men wanted, but the men stated they would join him. Victim Roser said that the situation seemed "very fishy," so he maintained that he would go alone to measure out the marijuana. He explained to the jury that he did not want the men to see how much marijuana he had. He said that it was at this point that the men became "hostile" and "the firearm came out."

Victim Roser testified that it was the Defendant who brandished the weapon and touched Victim Roser in his midriff area with the gun, stating that Victim Roser was being robbed. The men took Victim Roser's cellular telephone and the marijuana he had purchased from Mr. Barragan. The men then told Victim Roser that they were going back to Mr. Barragan's apartment for him to get more marijuana. When the men made it clear that Victim Roser was to get in the front seat of the green Xterra, he told them to take his speakers, his computer, and car. He said that the men were smiling and refused his offers, insisting that they would go to Mr. Barragan's apartment. He said he did not know the name of the man driving the vehicle but that the Defendant was seated behind the driver as they returned to Grand Forest Apartments. On the drive, the men instructed him to call Mr. Barragan and tell him that he wanted to purchase an ounce. After speaking with Mr. Barragan, the men warned Victim Roser that they would hurt him if he did not comply.

Victim Roser testified that during the drive, the men told him that they wanted one pound of marijuana. Victim Roser told the men that he did not believe Mr. Barragan had that amount. The men began to question him about whether there were guns in Mr. Barragan's apartment and how many people lived in the apartment. He described the men as "excited about it" on the drive, but once they arrived, the men grew more "serious." Victim Roser recalled that Mr. Barragan opened the door and Victim Webb was in the living room area inside the door. The men proceeded to Mr. Barragan's room at the back of the apartment where Zach Butler was already seated. Victim Roser said that Victim Webb did not initially go into the back bedroom with the rest of the men and Nathan McConnell was in the shower during the whole event. Once in the back bedroom, the Defendant again displayed the gun and indicated that it was a robbery, demanding "any kind of Marijuana or whatever." In very quick succession, Mr. Jamison took the marijuana, and the Defendant fired the gun three or four times.

Victim Roser stated that the Defendant shot Victim Webb and then shot Victim Roser in the leg. The men fled, and then Nathan McConnell entered the room, saw the injuries, and had a "breakdown." Due to the gunshot wound to his leg, Victim Roser was immobile and just waited for the police to arrive. He was transported to the hospital for treatment, where he remained for five days. He stated that both his tibia and fibula were "completely shattered." He said that there was still a bullet in his leg and that he had four screws and a rod in his leg that ran the total length of his leg. Victim Roser said that he required the use of a wheel chair for mobility for six weeks after he left the hospital and then began using crutches for the next four months while gradually placing more and more weight on his injured leg.

Victim Roser testified that he never saw Victim Webb with a gun. He said that he was positioned in front of Victim Webb. He said that he never heard Victim Webb cock a gun or chamber a round.

On cross-examination, Victim Roser clarified that he saw that there were three men in the Xterra when they were outside his apartment but that only the Defendant and Mr. Jamison exited the green Xterra. The third man remained in the vehicle. Victim Roser said that he never discussed money with the Defendant and Mr. Jamison. The Defendant pulled out his gun after Victim Roser showed the men that he had marijuana. Victim Roser denied volunteering to take the Defendant and Mr. Jamison back to Grand Forest Apartments to get more marijuana. He maintained that the men told him he would be returning to get more marijuana. Once inside the apartment, the men moved to the back room. On the way, the Defendant stepped into Mr. McConnell's room and looked through several drawers quickly and then joined the other men in the back room.

Frederick Kimber, a Knoxville Police Department officer, testified that on October

13, 2011, Investigator Tipton requested assistance in locating a vehicle. Officer Kimber proceeded to married housing for the University of Tennessee and was unable to find the vehicle. As he was leaving, he saw the vehicle parked in an adjacent lot located in front of the complex.

Rhett Barragan testified that on October 13, 2011, he lived in the Grand Forest Apartments with Nathan McConnell, Zach Cox, and Victim Webb. He was a student at the University of Tennessee at the time. He recalled that Zach Cox was not present at the apartment at that time and that he had a friend, Zach Butler, visiting from Mount Juliet, Tennessee. Mr. Butler had come to Knoxville to see a rock concert that took place the night before. Mr. Barragan recalled that Victim Roser had called him and asked if he could "pay a visit." Mr. Barragan agreed, and Victim Roser come over to the apartment for twenty to thirty minutes. After Victim Roser left, Mr. Barragan watched television in his bedroom. Approximately a half hour later, Victim Roser again called and asked if he could "come back by again," and Mr. Barragan agreed.

Mr. Barragan testified that when he heard the knock at the door, he first looked through the peephole before opening the door. When he saw Victim Roser standing there he opened the door and two men walked in directly behind Victim Roser. Mr. Barragan described the men as "sneak[ing]" in behind Victim Roser. Once inside, the men did not speak but were looking around. Mr. Barragan recalled that while they were still in the entryway, Victim Webb arrived home from work and made his way upstairs. Mr. Barragan invited the men back to his room where he was watching television. He said that he did not know the men and was feeling "very nervous" at this point. They all went back to his room and, shortly thereafter, Victim Webb joined them. Mr. Barragan said that the Defendant and Mr. Jamison were standing inside the room in front of the door and that he was standing directly in front of them inside the room. His friend, Mr. Butler, was seated in a computer chair, and Victim Roser was at the foot of the bed. When Victim Webb entered the room, he walked behind the Defendant and Mr. Jamison into the room and stood beside Victim Roser in front of the closet. Mr. Barragan said that Mr. McConnell was in the shower at this time.

Mr. Barragan testified that he had a bag of marijuana on his dresser. The Defendant and Mr. Jamison took the bag of marijuana, approximately an ounce and worth $300.00, upon seeing it and then demanded "whatever else." Mr. Barragan said that the Defendant pulled out a gun after taking the marijuana but before making the demand. Mr. Barragan said that he was scared. The Defendant had the gun pointed at Mr. Barragan's face, and Mr. Barragan told the men, "[O]kay, you have that, you know, just get out of here." Mr. Jamison then pushed Mr. Barragan down and told the Defendant to "bust him," and then the Defendant began firing the gun. Mr. Barragan said that the Defendant shot to the left and not directly forward where he was on the ground.

Mr. Barragan testified that he was aware that Victim Webb had purchased a gun about a month and a half prior to this incident. He stated that he was also aware that Victim Webb had the gun with him at the time of the shooting. He said that he learned this after the Defendant and Mr. Jamison had fled and he saw the gun lying on the floor. He denied seeing Victim Webb pull the gun out or hearing Victim Webb cock the gun. Mr. Barragan described himself as in a "frantic phase" following the shooting. He said that Mr. McConnell told him to move the gun, so he picked up the gun and then ran to a neighbor's apartment to ask that someone call for help because he was unable to find his cellular telephone. He described Victim Webb as unresponsive. He said that "Lauren" called 911 and that Mr. McConnell was on the telephone with the 911 operator for a period of time.

Mr. Barragan testified that he met Victim Webb during his Freshman year at the University of Tennessee. He explained that they lived on the same hall and, at the end of their Freshman year, they decided to rent an apartment together at Grand Forest Apartments.

On cross-examination, Mr. Barragan testified that Victim Roser was at his apartment on October 13, 2011, to buy marijuana. He agreed that he had been selling marijuana to Victim Roser "on and off." After his first trip to the apartment, when Victim Roser called to ask Mr. Barragan if he could come back to the apartment, Victim Roser never mentioned buying more marijuana or having anyone with him. Five or ten minutes later, Victim Roser knocked on the front door. Mr. Barragan stated that the two men were very close to Victim Roser as he entered the apartment, with their chests touching Victim Roser's back. Mr. Barragan said he was nervous as soon as he saw the men and no one spoke initially. He estimated that they stood in the front room for twenty or thirty seconds before he invited the men back to his room. Mr. Barragan said that Victim Roser did not speak and looked "white as a ghost."

Mr. Barragan testified that there was no discussion about drugs. The men entered the bedroom, the Defendant saw the marijuana on the dresser, took it, and then drew his gun. Mr. Barragan said that, until that point, the Defendant and Mr. Jamison acted "very weird[,] like they were just coming to hang out even though [Mr. Barragan] had no idea who they were." Mr. Barragan maintained that there was little talking between the men stating, "Yeah, it's that awkward when they first come into my house like I don't know what to say to these dudes." Mr. Barragan clarified that the Defendant did not take the marijuana until after Victim Webb was in the room. Mr. Barragan estimated that his entire encounter with the men lasted approximately four or five minutes.

Mr. Barragan testified that he took the gun that he found lying on the ground near Victim Webb to his neighbor's house. He stated that to move the weapon was "pretty dumb," but explained that he was in a "hectic state."

Patricia Tipton, a Knoxville Police Department officer, testified that she was notified of a shooting at Grand Forest Apartments. She proceeded to the location and coordinated investigation efforts at the crime scene. She issued a BOLO (Be On the Look Out) for a green Xterra and checked on the status of Victim Roser who had been transported to UT Hospital for a gunshot to the leg. Once the crime scene was secure, she returned to the Police Department and began conducting interviews with witnesses. The green Xterra was located on Fifth Avenue and the police gained consent to search from the Defendant's aunt, the registered owner of the vehicle. Officer Tipton said that she spoke with Victim Roser at UT hospital and located his vehicle in front of his apartment. She also attended Victim Webb's autopsy. Based upon the information gathered, Officer Tipton generated photographic lineups and ultimately identified the Defendant as a suspect. As the investigation continued, she also identified Mr. Jamison as a suspect. Because the Defendant had recently turned eighteen, she only had access to a photograph of him as a minor which she could not publish. She did, however, have a photograph of Mr. Jamison, who was not a minor, that she provided to the media in an effort to locate Mr. Jamison. Officer Tipton explained that A.D. was a minor at the time of these events, so a photograph could not be released to the media. Five days after the shooting, the police took Mr. Jamison into custody.

Officer Tipton testified that she reviewed the *Miranda* rights with Mr. Jamison and he waived those rights. He signed the waiver on October 18, 2011, at 12:12 p.m. The statement Mr. Jamison provided was consistent with his testimony at trial. Officer Tipton stated that the Defendant was arrested on December 16, 2011.

Chris Lochmuller, the Knox County Deputy Medical Examiner, testified as an expert in the field of anatomic, forensic, and clinical pathology. Dr. Lochmuller's examination revealed three gunshot wounds to Victim Webb: an entrance wound to the left shoulder, and two entrance wounds to the left side of the chest. Based upon the gunpowder particle present on the victim's shirt, Dr. Lochmuller estimated that the gun was within three feet of Victim Webb at the time it was fired. Dr. Lochmuller testified that the bullet to the shoulder passed through the shoulder bone which slowed the bullet enough to lodge it under the skin of the back. This bullet was removed and turned over to the police. The bullet to the chest entered the left side of the chest, went through the left lung, a major vessel that exits the heart, the right lung, and exited out the right side of the victim's back. Due to the injuries to the lung and major vessel, there were approximately three liters of blood in Victim Webb's chest, "a significant portion" of his blood volume. The third gunshot wound on the left side of the chest indicated that the bullet went through the left lung, the heart, the right lung, and stopped just under the skin on the right side of the chest. Dr. Lochmuller explained that the victim's arm "was shoring up or pressing against the right side of the chest keeping that bullet from exiting." This bullet was also removed and turned over to the police.

Dr. Lochmuller testified that he found blood in Victim Webb's stomach, indicating

that Victim Webb had coughed up blood from his lungs and then swallowed it. Based upon these findings, Dr. Lochmuller estimated that it would have taken "minutes" for Victim Webb to die. Dr. Lochmuller testified that the cause of Victim Webb's death was multiple gunshot wounds and the manner of death was homicide.

The Defendant testified that he was nineteen years old at the time of trial and eighteen on October 13, 2011. He stated that his birthday was September 30. The Defendant said that he met Mr. Jamison at the Bi-Lo on October 13, 2011, and they "rode around, smoked, did our thing." Later that day, the men began looking for "some more weed." They asked around "the strip" and were directed to Grand Forest Apartments. Upon arriving at the apartment complex, they asked the first person they saw if he knew where they could find any "Bud." The man said no but pointed out Victim Roser who was walking down the steps. They approached Victim Roser and asked about buying marijuana. Victim Roser asked if the men were police and then told them to follow him. Victim Roser parked at another set of apartments and walked over to the Defendant's vehicle. He asked what the men wanted and they told him "what [they] were looking for." The Defendant said that Victim Roser took out some marijuana and showed it to them, but stated that he could not sell it to the Defendant because he was about to sell it to someone else. The Defendant asked Victim Roser if he could get some more marijuana to sell to them. Victim Roser made a telephone call on his cellular telephone and then told the men that they would have to return to the Grand Forest Apartments. Victim Roser asked if he could ride with the men back to the Grand Forest Apartments, and they agreed. Specifically, Victim Roser asked to sit in the front seat and so the Defendant got into the back seat.

The Defendant testified that, once they were back at Grand Forest Apartments, he and Mr. Jamison followed Victim Roser upstairs to an apartment. Mr. Barragan opened the door and Victim Roser told him that Mr. Jamison and the Defendant were "with [him]" and "looking for a little bit of weed." The Defendant said they walked into the back room where there were three people. Three or four minutes later, another man entered and introduced himself. Mr. Jamison and the Defendant told the men what they were "looking for," and one of the men pulled out some marijuana and put it on a scale. The man asked for money and when the Defendant showed him his money, Victim Webb pulled out a gun. Mr. Jamison and one of the men got "into a scuffle," and so the Defendant took out his gun. The Defendant stated, "[Mr. Jamison] runs off, I run off, and I fired a couple shots, and that's - - leave the house." He stated that he fired two or three shots behind his back as he ran.

The Defendant testified that he did not rob Victim Roser and that Victim Roser got into the Xterra willingly. The Defendant stated that he did not return to Grand Forest Apartments to rob Mr. Barragan or steal the marijuana. The Defendant maintained that he did not take out his weapon until he saw another gun. He stated that he went to the apartment to buy drugs and that he had the gun with him to protect himself.

-12-

On cross-examination, the Defendant said that after the shooting he gave the gun back to Mr. Jamison. He explained that Mr. Jamison was staying with his grandmother and not allowed to have a gun while there, so the Defendant had offered to "hold it" for Mr. Jamison. He said that he had the gun for approximately two weeks. The Defendant said that he sold marijuana on the "east side" and needed to protect himself. He agreed that he believed that the marijuana "on campus" is "better" and therefore "brings more money." The Defendant stated that he had never met Mr. Barragan, Victim Webb, Mr. Butler, or Victim Roser before October 13, 2011.

The Defendant denied having been at Grand Forest Apartments the night before, circling the complex multiple times, or driving the wrong way in the apartments. He stated that Mr. Barragan did not look through the peephole before opening the door because the door "came open too quickly." He said that Mr. Barragan seemed surprised when he opened the door. The Defendant speculated that Mr. Barragan was surprised because he and Mr. Jamison are black. The men went to the back room where Victim Webb joined them at some point. Mr. Barragan weighed the marijuana, the Defendant took out $60.00, and then Victim Webb took out a black gun and stated, "give me all y'all money, give me everything you got." At this point one of the men ran up and tried to grab Mr. Jamison. Mr. Jamison pushed the man to the ground and they fled. The Defendant stated that he tried to reason with Victim Webb saying, "you ain't even gotta do this. What, you want this little bit of money right here?" Then Mr. Barragan attacked Mr. Jamison in an attempt to get Mr. Jamison's money.

The Defendant testified that Mr. Jamison pushed Mr. Barragan down and then they fled with the Defendant shooting behind him. The Defendant said that he did not call the police to report that he was a victim of a robbery, rather he "stay[ed] low." The Defendant stated that he switched vehicles with his mother because he was scared knowing that police were "on their way." When asked what he was afraid of given that he was the victim of the robbery, he stated, "I don't know." The Defendant said that, after these events, he did not stay at his home because the police had been there numerous times looking for him.

The Defendant testified that, after his arrest, he placed telephone calls from jail to his family and friends. He acknowledged that these telephone calls were recorded. He denied telling someone during one of these telephone calls that Mr. Jamison was a "snitch." He agreed that, during one of the telephone conversations, he told friends that they needed to watch Mr. Jamison's video-recorded interview with police where Mr. Jamison broke down and cried. He denied telling his friends that he wanted them to post this portion of the interview on Facebook. After listening to the recordings outside the presence of the jury, the Defendant changed his testimony, acknowledging that he did call Mr. Jamison a snitch and that he did ask his girlfriend to post the video of Mr. Jamison's statement on Facebook. The Defendant further acknowledged that he told "Lamar" that he would not go to court with Mr. Jamison "so that he can get on the stand and tell on [the Defendant]."

-13-

The State asked the Defendant about an incident that had happened the day before when the Defendant was being transferred from court back to the detention center. The Defendant was asked if he told other inmates that he planned to escape from the courtroom the next day. The Defendant denied saying he planned to escape, but he testified that he had said that it was possible to escape from the court room.

In rebuttal, the State called Emad Aljaber. Mr. Aljaber testified that he worked at Niro's Gyros with Victim Webb in October 2011. He said that, at the time, Victim Webb had worked at Niro's Gyros for five or six months. Mr. Aljaber said that Victim Webb's last day of work was October 13, 2011. Victim Webb left between 5:00 and 5:10 p.m. and Mr. Aljaber paid him in cash, $126.00, before he left that day.

Tracy Bradshaw, Victim Webb's mother, testified that the weekend before his death Ms. Bradshaw had paid Victim Webb $120.00 to help her transport a boat from one marina to another. His grandparents had also recently sent him $60.00.

Based on this evidence, the jury convicted the Defendant of two counts of especially aggravated kidnapping, two counts of aggravated robbery, four counts of first degree felony murder, one count of second degree murder, one count of attempted second degree murder, two counts of employing a firearm during the commission of a dangerous felony, and two counts of aggravated assault. The trial court merged the especially aggravated kidnapping convictions, the aggravated robbery convictions, the first degree felony murder convictions and the second degree murder conviction, the employing a firearm during the commission of a dangerous felony convictions and dismissed one count of aggravated assault. The trial court then sentenced the Defendant to serve concurrent sentences of life for the first felony degree murder conviction, fifteen years for the especially aggravated kidnapping conviction, eight years for the aggravated robbery conviction, and three years for the aggravated assault conviction. The trial court sentenced the Defendant to serve consecutive sentences of eight years for the attempted second degree murder conviction and six years for the employing a firearm during the commission of a dangerous felony conviction, for a total effective sentence of life plus fourteen years in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis

The Defendant asserts that: (1) the evidence is insufficient to support his convictions; and (2) the trial court erred when it allowed cross-examination of the Defendant about statements he made to other inmates about escaping from the courtroom. The State asks this Court to affirm the trial court's judgments.

### A. Sufficiency of the Evidence

The Defendant "requests review of whether the jury's resolution of the conflicting facts, in light of the forensic and other testimonial evidence presented, was reasonable." The Defendant specifically identifies Victim Roser's account of the events as a robbery versus his own testimony that the incident was a consensual encounter where he used his gun "to assist in his escape from the residence." The State responds that there is ample evidence upon which a jury could find the Defendant guilty beyond a reasonable doubt. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

The evidence, considered in the light most favorable to the State, shows that the Defendant, armed with a weapon, went to Grand Forest Apartments looking for marijuana. As Victim Roser, who had just purchased marijuana from Mr. Barragan, approached his vehicle, the Defendant and Mr. Jamison asked him about buying marijuana. The Defendant followed Victim Roser to another location, Victim Roser's apartment complex, where he and Mr. Jamison inspected Victim Roser's marijuana outside Victim Roser's apartment. When Victim Roser insisted on weighing out the marijuana in his apartment alone and returning to the men with the amount requested, the Defendant displayed a gun and told Victim Roser he was being robbed. The Defendant took Victim Roser's marijuana while holding him at gun point and then told Victim Roser that he would be returning to the apartment where he got the marijuana to procure more marijuana for the Defendant and Mr. Jamison. Victim Roser got into the green Xterra at gunpoint with the Defendant and rode back to Grand Forest Apartments, where he gained entrance for the Defendant and Mr. Jamison into Mr. Barragan's apartment. Once inside the apartment, the Defendant took Mr. Barragan's marijuana, pulled out his gun, and demanded "whatever else." When Mr. Barragan tried to convince the men to take the marijuana and leave, Mr. Jamison shoved Mr. Barragan to the ground, and the Defendant shot Victim Webb in the chest and Victim Roser in the leg before fleeing. This is sufficient evidence upon which a jury could find the Defendant used a gun to rob Victim Roser and then take him against his will to Mr. Barragan's apartment to obtain more marijuana. The evidence further supports a jury finding that at Grand Forest Apartments the Defendant used the gun to steal from Mr. Barragan before shooting and killing Victim Webb and shooting Victim Roser in the leg.

The Defendant contends that the inconsistencies in Victim Roser's and the

-16-

Defendant's testimony at trial calls into question the jury's resolution of the testimonial evidence presented. We reiterate that the trier of fact resolves questions concerning the credibility of witnesses, the weight and value of the evidence, and all factual issues raised by the evidence; an appellate court should not re-weigh or re-evaluate the evidence. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *Bland*, 958 S.W.2d at 659. Furthermore, a verdict of guilt by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in favor of the prosecution's theory of the case. *Bland*, 958 S.W.2d at 659. In this case, by its verdict, the jury accredited the State's witnesses' testimony and resolved any inconsistencies in favor of the State's theory that the Defendant committed the offenses for which he was convicted.

Accordingly, we conclude that the proof is sufficient to support the Defendant's convictions beyond a reasonable doubt. The Defendant is not entitled to relief.

### B. Cross-Examination of the Defendant

The Defendant contends that the trial court improperly permitted the State to cross-examine him regarding statements he made to other inmates about a possible escape from the courtroom. He asserts that the testimony was improperly admitted because it did not establish conduct constituting escape, it was merely the discussion of escape. The State responds that, because the probative value of the testimony outweighed any unfair prejudicial effect toward the Defendant, the trial court did not abuse its discretion in admitting the testimony. We agree with the State.

"Admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id*. Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

During a jury-out hearing, the State argued that it should be permitted to question the Defendant about statements he made that were overheard by an officer. After the second day of trial, as the Defendant was being transported along with other inmates from the courthouse to the detention facility, the Defendant was overheard stating that he could take a court

officer's weapon and use it to escape from the courtroom. The State argued that these statements indicated consciousness of guilt and should therefore be admitted. The trial court ruled that the testimony was admissible but prohibited the State from asking questions about use of the court officer's gun for the escape. The trial court stated its reasoning as follows:

> [T]he Court would find a plan to escape akin to flight and indicative of awareness of guilt or consciousness of guilt. The Court will, however, grant the motion - - the [D]efendant's motion as to any reference to a gun - - . . .

> - - because what he's charged with is grabbing a gun and firing wildly and killing a man, and for the Jury to hear that he talked about doing the same thing in this Courtroom, I think, would be inflammatory and prejudicial - - unfairly prejudicial.

> . . . .

> At this point, the only thing the Court will permit is for you to . . . ask him if it's not true that yesterday he expressed a plan to escape from the Courtroom today.

The Defendant acknowledges that Tennessee courts have found evidence of consciousness of guilt, such as flight, to be probative of guilt and admissible. He argues, however, that the evidence was not actual conduct involving escape but rather a discussion of escape. The State points out that the Defendant's plan to escape was thwarted when an officer overheard the Defendant's statement, and the record shows that heightened security was implemented in the courtroom the day following the Defendant's statements.

We recognize that evidence of escape and attempted escape by a defendant is admissible for the purpose of establishing guilt, consciousness of guilt, or knowledge of guilt. *State v. Burton*, 751 S.W.2d 440, 450 (Tenn. Crim. App. 1988). We are unaware of any authority, and the Defendant fails to cite to any authority, that would make a thwarted plan of escape inadmissible as evidence of consciousness of guilt. We conclude that the trial court properly limited the cross-examination and did not abuse its discretion in permitting the State to cross-examine the Defendant about his statements regarding a plan of escape. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE